**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Mayo Foundation for Medical Education and Research, and Mayo Foundation,

Defendants.

Civ. No. 01-1121 (RHK/SRN)
**MEMORANDUM OPINION AND ORDER FOR JUDGMENT**

---

Gerald Leedom and Jennifer Brown, United States Department of Justice, Tax Division, Washington, D.C., for Plaintiff.

Thomas W. Tinkham and John Windhorst, Dorsey & Whitney, P.L.L.P., Minneapolis, Minnesota, for Defendants.

---

## Introduction

The United States commenced this action to recover approximately $4.1 million paid as a refund to Defendants Mayo Foundation for Medical Education and Research ("MFMER") and the Mayo Foundation ("the Foundation") in 1999. That refund represents taxes originally collected from Defendants under the Federal Insurance Contributions Act ("FICA" or "the Act"), 26 U.S.C. §§ 3101 et seq., on stipends paid to residents and fellows of the Mayo Graduate School of Medicine ("MGSM") in calendar

AUG 0 4 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD AUG 0 4 2003
DEPUTY CLERK

year 1995.[1] Defendants asserted a counterclaim seeking a refund of FICA taxes paid with respect to stipends awarded to residents in calendar years 1994 and 1996.[2] The refunds sought for 1994 and 1996 are approximately $3.4 million and $4.5 million, respectively. Defendants claim that the stipends should not have been subject to FICA taxation because the patient-care services rendered by the residents in connection with those stipends were not within the Act's definition of "employment." Defendants allege that the residents' services fall within a "student" employment exception to FICA taxation.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1340, 1345, 1346(a)(1) and 26 U.S.C. §§ 7402(a) and 7405. This matter was tried before the undersigned without a jury on May 20, 21, and 22, 2003. This Memorandum Opinion and Order for Judgment is based on the admissible evidence introduced at trial, the Court's observations of the witnesses, and its determinations regarding the weight to be afforded their testimony; it also constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

---

[1] A "resident" has received a Doctor of Medicine ("M.D.") degree and is participating in a residency program for additional medical training in a specialty field, such as internal medicine or surgery. A "fellow," typically, is participating in a sub-specialty program that offers more specialized training beyond that gained in the residency program. "Fellowship programs" are generally taken after an initial residency. In their refund claims, Defendants have used the term "residents" to refer to both residents and fellows. (Pl.'s Ex. 14.) The Court will use the same terminology.

[2] Defendants also assert a counterclaim seeking additional interest on the 1995 refund amount. The parties, by a Stipulation dated August 13, 2002, have agreed on the *amount* of additional interest potentially at stake.

## Background

### I. An Overview of the FICA Tax

FICA taxes support the Social Security system, that "form of social insurance . . . whereby persons gainfully employed, and those who employ them, are taxed to permit the payment of benefits to the retired and disabled, and their dependents." Flemming v. Nestor, 363 U.S. 603, 609 (1960). Section 3101(a) of the Internal Revenue Code imposes FICA taxes on "wages"[3] received by an individual "with respect to employment." 26 U.S.C. § 3101(a). There are two subcategories of FICA taxes: a 1.45% tax that supports Medicare, and a 6.2% tax that supports "old age, survivor, and disability insurance." (Trial Tr. at 15.)

Employers collect FICA taxes by withholding the required amount from their employees' wages. See 26 U.S.C. § 3102(a). Employers themselves also pay a FICA contribution in an amount equaling that withheld from their employees' wages. See 26 U.S.C. § 3111(a). "Thus, FICA taxes are 'paid in part by employees through withholding, and in part by employers through an excise tax.'" Ahmed v. United States, 147 F.3d 791, 794 (8th Cir. 1998) (quoting United States v. Lee, 455 U.S. 252, 254 n.1 (1982)). Defendants' refund claims for 1994 and 1996 involve both the employer's portion of the FICA taxes and, where individual residents have consented to have a claim brought on

[3] FICA defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a).

their behalf, the employee portion as well. (See Trial Tr. at 15-16.)

## II. Defendants Mayo Foundation for Medical Education and Research ("MFMER") and Mayo Foundation ("the Foundation")

The Foundation is a Minnesota nonprofit corporation having its principal place of business in Rochester, Minnesota. (See Defs.' Ex. 236.) It is also a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, having as its charitable purposes medical education and scientific research. (See Defs.' Ex. 313.) It is the parent corporation for all of the outpatient, inpatient, education, and research activities at all Mayo sites. (Pl.'s Ex. 18 at 1.) The Foundation is composed of distinct, but fully integrated, operational units which, in the mid 1990s, included:

- Mayo Clinic Rochester (encompassing Saint Mary's Hospital and Rochester Methodist Hospital);
- Mayo Medical School;[4]
- Mayo Graduate School;
- Mayo School of Health-Related Sciences;
- Mayo Graduate School of Medicine;
- Mayo School of Continuing Medical Education;
- Mayo Clinic Jacksonville, in Florida; and
- Mayo Clinic Scottsdale, in Arizona.

[4] The Mayo Medical School offers a four-year program leading to Doctor of Medicine (M.D.) degree.

(Id.) The Court finds that, thus, the Foundation operates five educational institutions.

The Mayo Foundation Education Committee coordinates the activities of the several Mayo schools, having final authority over all educational matters. (Id. at 8.) The deans of the Medical School, the Graduate School, the Graduate School of Medicine, the School of Health Sciences, and the School of Continuing Medical Education are members of the Foundation's Education Committee. (Id. at 21.)

The vast majority of the full-time physicians on the staff of the Mayo Clinics are also faculty of one or more of the Foundation's schools. (See Trial Tr. at 139, 152-53, 213; Pl.'s Ex. 18 at 39.) All staff physicians (and, therefore, all faculty) are employed and paid by the Foundation. (Pl.'s Ex. 18 at 22.) The staff physicians are not paid an additional amount to serve as faculty. (Trial Tr. at 152.) Appointments to the faculty of the various schools at Mayo are made by the Foundation's Academic Appointments and Promotions Committee that, in making appointments, utilizes written guidelines outlining the achievements necessary to be appointed as, or achieve promotion to, an instructor or professor at Mayo. (Id. at 115-16.)

First accredited by the North Central Association of Colleges and Schools in 1984 (Pl.'s Ex. 18 at 2), the Foundation – through the Mayo Medical School and the Mayo Graduate School, respectively – grants M.D. and Ph.D. degrees. (Trial Tr. at 87.) The Foundation – through the Mayo Graduate School of Medicine ("MGSM") – also awards

certificates to individuals completing residency and fellowship programs.[5] (Defs.' Exs. 286 at Bates No. F-016, 287 at Bates No. MC-081, and 288 at Bates No. F-044; Trial Tr. at 129, 236, 303, 331-32.) The Foundation provided residents in the mid 1990s with substantial facilities and resources, including an Office of Minority Student Affairs, a Health Service, professional counseling, one of the largest medical libraries in North America, computer facilities, laboratories, and classrooms. (Pl.'s Ex. 18 at 10; Trial Tr. at 142-44, 334-40.) Each school, including the MGSM, had an academic and student affairs office. (Pl.'s Ex. 18 at 10.)

Defendant MFMER is a Minnesota nonprofit corporation having its principal place of business in Rochester, Minnesota. (Defs.' Ex. 243.) MFMER is the agent of the Foundation under 26 U.S.C. § 3504 for purposes of withholding and remitting FICA taxes and filing related tax returns. (Defs.' Ex. 334.) MFMER is also the paying agent for most Mayo entities and disburses stipends to residents.[6]

---

[5] In 1995, the North Central Association of Colleges and Schools ("NCA") determined that the educational activities of the MGSM were outside the scope of specific NCA accreditation. (Pl.'s Ex. 18 at 38.)

[6] The stipend disbursements "result in inter-company debts owed by Mayo Foundation, Mayo Clinic Jacksonville, and Mayo Clinic Scottsdale to MFMER." (Pl.'s Ex. 12.) "These debts are periodically consolidated with other inter-company debits and credits, and the net debts paid." (Id.)

## III. The Mayo Graduate School of Medicine ("the MGSM")

The MGSM is an unincorporated division, or operating unit, of the Foundation.[7] (Trial Tr. at 86, 111.) In the mid 1990s, the goals and purposes of the MGSM were

- to provide educational programs of excellence to prepare physicians and scientists for the practice of medicine, medical research and medical education in the United States and abroad;
- to support and enhance the quality, the efficiency, and the intellectual stimulation of medical practice at Mayo;
- to educate a sufficient number of physicians and scientists in preparation for appointment to the staff of Mayo Foundation and to contribute to national needs;[8] and
- to expand educational programs in response to changing needs in proper relationship to the growth of clinical practice at all Mayo Group Practices;

(Pl.'s Ex. 18 at 16; see also id. at 72.) In 1994, the Accreditation Council on Graduate Medical Education ("the ACGME") accredited MGSM as an institution for graduate medical education for a period of five years.[9] (Id. at 6; Trial Tr. at 332.) Approximately

---

[7] From 1915 until 1989, the MGSM awarded degrees, including Ph.Ds. In 1989, the Foundation created the Mayo Graduate School to separate the graduate degree-granting activities from the MGSM's residency and fellowship programs. (Pl.'s Ex. 18 at 38.)

[8] Former residents of the MGSM testified that, when they began their residencies, they had no expectation of being hired by the Foundation as a staff physician upon completion of their programs. (Trial Tr. at 237, 261.)

[9] The ACGME includes representatives from the American Board of Medical Specialties, the American Hospital Association, the American Medical Association, the Association of American Medical Colleges, and the Council of Medical Specialty Societies.

ninety percent of the residency programs at the MGSM have been reviewed and approved by ACGME residency review committees. (Trial Tr. at 322-23, 325-27.)

From 1994 through 1996, the MGSM offered approximately 150 residency and fellowship programs in various medical specialties and sub-specialties at three locations: (1) Rochester, Minnesota; (2) Jacksonville, Florida; and (3) Scottsdale, Arizona. (See Trial Tr. at 326-28.) Each year approximately 1,000 residents participate in MGSM residency programs. (Id.) The length of a residency program is generally three to seven years. (See Defs.' Ex. 202 at EA4.01, 275 & 276.) Between 1994 and 1996, most of the residency programs, and therefore the majority of the residents, were based in Rochester.[10] The residency programs span virtually all of the recognized specialty areas, from broad generalist areas, such as Family Medicine and General Internal Medicine, to highly specialized areas in which only one person trains at a time. (Pl.'s Ex. 18 at 39.)

The MGSM is administered by an Education Committee consisting of faculty and staff from Rochester, Jacksonville, and Scottsdale. (Trial Tr. at 177.) The MGSM Education Committee oversees all of the educational activities at all three sites and reports to the Foundation Education Committee. (Id.; Pl.'s Ex. 18 at 8.) It sets policies and standards governing the operation of the residency programs and recommends to the Foundation's Education Committee the level at which residents' stipends and benefits

---

[10] In 1994, 132 residency programs were based in Rochester, eleven were based in Jacksonville, and nine were based in Scottsdale. (Defs.' Ex. 275.) Residents can rotate among the three sites during the course of their training. (Defs.' Ex. 201 at PD 129-38.)

should be set. (Defs.' Ex. 201, 280 & 282-85.) A separate education committee also exists at each of the three Mayo locations. (See Trial Tr. at 181-82.)

The MGSM Education Committee appoints a director for each residency program, who makes academic and disciplinary decisions regarding the residents in that program. (Defs.' Exs. 201, 223.) The MGSM Education Committee and the director for each accredited residency program prepare a written curriculum for that program, designed to conform to the requirements of the national certifying board for that speciality and the applicable residency review committee of the ACGME. (Trial Tr. at 213, 327.)

## IV. Medical Residents at the MGSM

Individuals entering a residency program at MGSM have completed four years of medical school and received a Doctor of Medicine degree ("M.D."). (See Defs.' Ex. 201 at PD 068-82.) Between 1994 and 1996, the MGSM assigned each entering resident a faculty advisor to provide comprehensive educational advice and personal support. (Pl.'s Ex. 35 at 18.) Residents in the mid 1990s did not pay tuition to participate in a residency or fellowship program.[11] (Trial Tr. at 147, 166.)

Residents in programs based in Minnesota were not eligible, at the start of their residencies, to obtain licenses to practice medicine in Minnesota. After one year of residency (two years for graduates of foreign medical schools), residents could apply for

[11] If the MGSM were to charge tuition, it would likely increase the stipends paid to residents in order to compensate for the additional expenses the residents must pay. (Trial Tr. at 166, 329-30.)

licensure in Minnesota.[12] A resident not licensed in Minnesota was required to hold a "residency permit."[13] Similar provisions applied for MGSM residents in Jacksonville and Scottsdale.[14] The MGSM required its residents to obtain state licenses at the first possible opportunity. (Trial Tr. at 153-54.) Licensed residents can write prescriptions, and Medicare will reimburse for the services of licensed residents in out-patient clinics and in unaccredited programs. (Id. at 154.)

Much of the training in the MGSM's residency programs involved clinical experiences, in which a resident learned by doing a medical task under the direct and personal guidance and supervision of a full-time Mayo staff physician. (Pl.'s Ex. 30; Trial Tr. at 119-21, 238-39, 241, 264, 298-302, 380-81, 389-93.) In that clinical setting, residents would also "make rounds" with their supervising staff physician once or twice each day.[15] (Id. at 199-201, 205, 231, 300.) On rounds, the staff physician and residents would move from patient to patient; the staff physician would conduct didactic sessions with the residents both during and/or after rounds that would draw out and explain the

---

[12] See Minn. Stat. §§ 147.02, subd. 1(d), 147.037, subd. 1(d).

[13] See Minn. Stat. § 147.0391.

[14] See Fla. Stat. §§ 458.345 and 458.311(1)(f)(1)(C); Ariz. Rev. Stat. §§ 32-1422(A)(2) and 32-1432.02.

[15] For example, in nephrology, the study of diseases of the kidney, a supervising staff physician would spend two-and-a-half or three hours with residents in the morning, reviewing patient status, meeting with patients, and discussing the patients' cases with the residents. That physician would return in the afternoon to spend another two hours with the residents reviewing the status of his patients. (See Trial Tr. at 231.)

salient educational points of each patient's condition. (Id. at 205-06, 300-01.)

Between 1994 and 1996, the MGSM offered three "primary care" residency programs: internal medicine, family practice, and pediatrics.[16] (See Trial Tr. at 309.) The curriculum for the internal medicine program, for example, involved monthly rotations through various "services" or disciplines, including hematology/oncology, critical care, neurology, cardiology, thoracic disease, gastroenterology, geriatrics, endocrinology, and emergency medicine.[17] (Pl.'s Ex. 28 at 11.) Some rotations were required in the internal medicine program; others were electives.[18] (Trial Tr. at 127-28.) The curriculum also set a number of months of "meaningful patient responsibility" or "MPR" to be completed for

---

[16] "Primary care" practitioners see patients in their initial contact with a doctor regarding a medical problem. That primary care physician may refer the patient to a specialist, if necessary. (Trial Tr. at 309.) Thus, it is unremarkable that the curriculum for a residency program *in internal medicine* states that "primary care will be emphasized throughout the residency." (See Pl.'s Ex. 28.)

[17] With respect to the discipline of "emergency medicine," for example, a 1992 description of the residency program at Mayo Clinic Jacksonville stated that first- and second-year residents would spend a four-week block of time in the emergency room at St. Luke's Hospital. (Pl.'s Ex. 28, sec. XVIII at 14.) "A resident will work 50-60 hours a week in shifts of 8 or 12 hours. Residents will not be assigned to duty more than 12 consecutive hours separated by an interval of at least 8 hours." (Id.) Internal medicine residents assigned to the emergency room were supervised, on-site, by staff emergency room physicians who were full-time and board certified by the American Board of Emergency Medicine and were physically present twenty-four hours a day and seven days a week. (Id. at 15.) The internal medicine resident would almost always be the first physician to see and evaluate patients in the emergency room; the resident would then review the history, physical findings, and recommendations with the supervising staff physician. (Id.)

[18] The Court rejects the United States' assertion that what defines a "rotation" is the hospital or clinic at which the resident is present. (See Pl.'s Opening Trial Br. at 3.)

each year of the program, defining "MPR" as "direct and comprehensive care of patients which includes responsibility for record-keeping and management under supervision of an attending physician."[19] (Pl.'s Ex. 28 at 11.)

For each rotation, residents were assigned textbooks and journal articles relevant to the subject matter of that rotation. (Trial Tr. at 206-07, 241, 295; Defs.' Exs. 294-296.) The MGSM's residency programs also included "didactic training," which involved (1) core curriculum conferences, (2) primary care conferences, (3) grand rounds,[20] (4) morbidity and mortality conferences, and (5) journal clubs. (Pl.'s Ex. 35 at 8; Trial Tr. at 197-201, 298.) Thus, the MGSM told prospective internal medicine residents that

> [a] comprehensive, three-year didactic core curriculum and written syllabus cover both inpatient and outpatient medicine. During [the first year of the residency], the weekly core curriculum covers topics you should master during your first year. These are supplemented by regular cardiology core lectures during the cardiology rotation. During [the second and third years of the residency], you will attend weekly core lectures specifically prepared

[19] The 1992 description of the residency program for internal medicine at the Mayo Clinic Jacksonville states that "house officers" obtain MPR by virtue of the fact that all patients hospitalized on internal medicine services would be assigned to an internal medicine resident who would be responsible for "the total care of all patients that he or she admits under the supervision and guidance of the attending staff responsible for the service." (Pl.'s Ex. 28, sec. XVIII at 20.) "The resident will perform the admission examination, order appropriate diagnostic studies, plan a therapeutic program, discuss the results of studies with the patient and the family, and make recommendations for treatment and followup." (Id. at 20-21.)

[20] For "grand rounds," faculty and residents would gather in a large amphitheater for a lecture by a professor, graduate student, or resident on a specific aspect of medicine. Following the lecture, there generally would be a question and answer session. (Trial Tr. at 199, 338-39.) The "grand rounds" in Rochester are broadcast to the Jacksonville and Scottsdale sites. (Id. at 339.)

for each subspecialty rotation.

(Defs.' Ex. 268, sec. 28.) Thus, for the three years of the internal medicine residency, residents were to attend approximately 900 lectures and conferences dedicated to resident training. (Id.) Attendance at conferences and teaching rounds was mandatory. (See Trial Tr. at 298.)

The MGSM assessed the achievements of its residents through clinical evaluations by staff physicians, periodic program examinations, and national specialty board examinations. (See Pl.'s Ex. 18 at 72; Defs.' Ex. 287 at Bates No. MC-029; Trial Tr. at 205.) Mayo staff physicians evaluated and graded the performance of the residents assigned to them in each rotation. (Trial Tr. at 128-29, 205, 275-76, 297; Defs.' Exs. 286, 287 & 306.) Residents also took written tests to determine their success in mastering course material. (Trial Tr. at 246, 277, 302, 384-86.) Transcripts for residents at the MGSM between 1994 and 1996 bear letter grades for each completed rotation in a given subject area. (See, e.g., Defs.' Exs. 286 at Bates No. F-015; Defs.' Ex. 287 at MC-080.)

Upon successfully completing the curriculum of an MGSM residency program, a resident received a certificate from the Mayo Foundation. (Trial Tr. at 129; Defs.' Ex. 286 at F-016; Defs.' Ex. 287 at MC-081.) The director for that residency program also sent a "certificate of completion of specialty board education requirements" to the appropriate specialty board, thereby establishing that the resident is eligible to take the board's examinations. In order to be certified to practice in a given field of medicine, the

resident must complete that specialty's board examinations. (Defs.' Ex. 331 at 11.)

Between 1994 and 1996, MFMER paid residents a stipend. The stipend amount generally increased in each year of the program, but was uniform for all residents at a given seniority level, for all specialty and sub-specialty programs at all three sites.[21] (Trial Tr. at 165.) The stipend amounts also did not vary with the number of hours worked. (Id.) The Foundation set stipend levels based on national data regarding residency stipends; the stipends paid to Mayo residents were intended to approximate the national average.[22] (Trial Tr. at 166-67, 317-18, 325.)

## Analysis

### I. Exemptions from FICA Taxation

FICA taxes must be paid on "wages" – that is, on "all remuneration for employment." 26 U.S.C. §§ 3101, 3121(a). FICA broadly defines "employment" as "any service of whatever nature, performed . . . by an employee for the person employing him, irrespective of the citizenship or residence of either . . . within the United States . . . ." 26

---

[21] From January 1 through December 27, 1994, the annual stipend ranged from $29,320 in Year 1 through $41,015 in Year 9. For the period of December through April 30, 1996, the comparable range was from $30,436 to 42,451. For the period from May 1 through December 31, 1996, the comparable range was form $31,712 to $44,361. (Defs.' Ex. 280.)

[22] The Foundation provides medical plan options, prescription drug plans, dental assistance plans, and paid vacation time, to its residents. (See Trial Tr. at 52; Pl.'s Ex. 22.) The Foundation also gives residents the opportunity to purchase benefits such as life insurance, disability insurance, and accidental death and dismemberment insurance. (Trial Tr. at 167.) Whereas residents have the option to purchase such life and disability insurance coverage, the Foundation pays for such coverage for staff physicians.

U.S.C. § 3121(b). The Act excludes, however, several categories of "service" from "employment," including

> service performed in the employ of –
>
> (A) a school, college, or university . . .
>
> * * * * *
>
> if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university;

26 U.S.C. § 3121(b)(10). Defendants contend that this "student" exemption applies to the services performed by residents who received stipends between 1994 and 1996. The United States challenges Defendants' claim, both as a matter of law and on the facts of this case.

### A. Availability of the "Student" Exclusion as a Matter of Law

The United States contends that the "student" exception cannot, as a matter of law, apply to medical residents. (See Pl.'s Opening Trial Br. at 7-11; Pl.'s Reply Trial Br. at 1.) It points out that Congress, in 1965, repealed an exemption from FICA taxation for "interns."[23] In so doing, the House observed that

---

[23] Former section 3121(b)(13), enacted in 1939, exempted from FICA taxation wages earned in connection with

> . . . service performed as an intern in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law.

See St. Luke's Hospital Ass'n v. United States, 333 F.2d 157, 158 (6th Cir. 1964) (quoting

> [t]he coverage of services as an intern would give young doctors an early start in building up social security protection and would help many of them to become insured under the program at the time when they need the family survivor and disability protection it provides. . . . Interns would be covered on the same basis as other employees working for the same employers, beginning on January 1, 1966.

H.R. Report No. 213, 89th Cong., 1st Sess., H.R. 6675, n.1, P.L. Law 89-97. The United States asserts that repeal of the "medical intern" exemption in 1965 evidences Congress's intent to bring all young doctors-in-training within the scope of Social Security coverage and, hence, FICA taxation. The government contends that it would be highly incongruous for Congress to have repealed the "intern" exemption for those pursuing a one-year course of post-M.D. training and yet exempt the services of medical residents and fellows, who are pursing *several years* of training after receiving their M.D. degrees.

This Court previously considered the United States' arguments in Minnesota v. Chater, Civ. No. 4-96-756, 1997 WL 33352908 (D. Minn. May 21, 1997) (Montgomery, J.), aff'd sub nom. Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998).[24] There, the Commissioner argued that Congress's failure in 1939 to mention "residents" when enacting the "intern" exemption, and its decision in 1965 to repeal the "intern" exemption, precluded the Court, as a matter of law, from considering whether residents at the University of Minnesota Medical School were exempt, as "students," from FICA

---

26 U.S.C. § 3121(b)(13) (repealed)).

[24] The Eighth Circuit's opinion affirming Judge Montgomery's decision does not explicitly address the issue of the "intern" exception and its repeal.

taxation. Judge Montgomery rejected the government's arguments, reasoning that

> [s]ince, in 1939, the term resident encompassed both residents-in-training (like the residents of today) and regular staff physicians, it is understandable that Congress would not want to exclude all "residents" as the term was then defined. Instead, in light of the educational purpose of resident training programs, it was proper for Congress to allow the coverage status to depend on whether they qualified for the student exclusion.

Chater, 1997 WL 33352908 at *10. Thus, Judge Montgomery found no inconsistency in the fact that Congress enacted a specific exclusion for "interns" but remained silent about residents; the latter could obtain exemption under the more general "student" exemption. For the same reason, it was not "an anomaly to allow residents to be excluded from coverage under the Act after interns were no longer excluded following repeal of the intern exclusion." Id. As the Court observed, "[w]hile both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of a residency was (and is) on education." Id. at *11.

The Eighth Circuit affirmed Judge Montgomery's decision, explicitly rejecting the Commissioner's assertion that courts should defer to a "bright-line" agency ruling that medical residents can never be exempted from FICA taxation as students. Apfel, 151 F.3d at 748. Relying on the language of the regulation implementing the Social Security Act's statutory student exemption, the court of appeals held that determining whether medical residents are exempt as "students" from paying FICA contributions must be done through a case-by-case examination of the residents' relationship with their school. Id.

The United States' arguments in this case do not persuade the Court that it should deviate from the fact-specific, case-by-case examination directed by Apfel. The Court therefore rejects the United States' contention that, as a matter of law, residents can never be exempt, as "students," from FICA taxation.

Furthermore, consistent with Judge Montgomery's analysis in Chater, the record in this case supports a finding that "internships" and "residencies" were of a different nature. (Trial Tr. at 315-17.) The practice of offering "internships" as a training opportunity distinct from residencies ceased entirely in the United States in 1975. (Defs.' Ex. 331 at 13.) By the mid-1990s, almost no physicians entered the practice of medicine after only one year of graduate medical education. (See Trial Tr. at 161-62.) Rather, to practice medicine in a given field, and in most cases to be admitted to a hospital staff, an individual holding an M.D. degree typically must (1) complete an accredited residency training program of at least three years' duration in a clinical specialty field, and (2) become certified by a specialty board that is a member of the American Board of Medical Specialties. (See Defs.' Ex. 331 at 11.)

The Court concludes that the "student" exemption from FICA taxation can apply to residents. It now turns to the burden of proof necessary to establish whether that exemption applies.

**B. Burden of Proof**

The parties do not dispute that Defendants bear the burden of establishing that the "student" exemption of § 3121(b)(10) applies to the residents who served at Mayo between 1994 and 1996. Furthermore, the Court recognizes that exemptions from taxation are matters of legislative grace to be construed narrowly. United States v. Centennial Sav. Bank F.S.B., 499 U.S. 573, 583 (1991). The United States contends, however, that the Court cannot "imply" an exemption for medical residents and that Defendants must prove the application of the exemption by "clear and convincing evidence." Neither contention has merit.

The government cites United States v. Wells Fargo Bank, 485 U.S. 351 (1988), for the well-settled principle that "exemptions from taxation are not to be implied; they must be unambiguously proved." 485 U.S. at 354. In contrast to Wells Fargo, however, this case does not call for an exemption to be *implied* from recourse to law outside the Internal Revenue Code. Cf. 485 U.S. at 355 (observing that appellees sought to establish an exemption by referring outside the Code, to the Housing Act). Rather, this case presents the narrow question of whether an *express* exemption set forth in FICA *applies* to the individuals who served as residents at Mayo. "The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992). Indeed, as

the government has presented no compelling argument that the language of § 3121(b)(10) or its implementing regulations has any meaning other than its natural and plain meaning, recourse to legislative history is unnecessary.

As for the government's assertion that Defendants must prove that an exemption applies by "clear and convincing evidence," the Court finds no basis for imposing a heightened standard of proof on Defendants.

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.
>
> Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.
>
> In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt.
>
> The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof.

> Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases.

Addington v. Texas, 441 U.S. 418, 423-24 (1979) (footnote and internal citations omitted) (determining standard of proof necessary for Due Process in involuntary commitment proceeding).

Nothing in § 3121 or its legislative history expresses a statutory intent to depart from the traditional "preponderance-of-the-evidence" burden of proof applicable to civil litigation. See, e.g., Grogan v. Garner, 498 U.S. 279, 286 (1991) (beginning inquiry into appropriate burden of proof under 11 U.S.C. § 523 by examining statutory language and legislative history). More significantly, the government has cited no case in which a party asserting an exemption from FICA taxation under § 3121 has been required to prove that exemption by "clear and convincing evidence." The case of United States v. Stewart, on which the United States wholly relies, is inapposite. See 311 U.S. 60, 67-68 (1940) (finding no "clear and convincing evidence" that a 1938 amendment to section 26 of the Federal Farm Loan Act "was designed to change existing law" and broaden the scope of an exemption so as to encompass certain capital gains). The issues presented in this litigation do not involve fraud or quasi-criminal activity, nor do they implicate important individual liberty interests, such as those associated with parental rights, naturalization, deportation, or involuntary commitment. The Court will apply the "preponderance-of-the-evidence" burden of proof in evaluating Defendants' evidence.

## C. Relevant Eighth Circuit Precedent

As mentioned above, the Eighth Circuit has previously addressed the exemption of medical residents from FICA taxation. Apfel, 151 F.3d at 747-48. In Apfel, the State of Minnesota brought suit against the Commissioner of Social Security to challenge the assessment of unpaid social security contributions on stipends paid to medical residents at the University of Minnesota Medical School.[25] Id. at 744. This Court granted the State's motion for summary judgment and overturned the assessment, relying on two alternative grounds. First, the Court concluded that the medical residents were not "employees" of the University under the terms of a written agreement between the state and the Social Security Administration ("SSA"). Id. Alternatively, the district court concluded that, even if the residents were "employees" under the agreement, they were excluded from coverage under a statutory "student" exclusion. Id. The Eighth Circuit affirmed the district court on both alternative grounds. Id. at 747-48. Relevant to this action is the Eighth Circuit's analysis of the statutory "student" exclusion.

The Social Security Act provides that agreements between a state and the SSA "shall, if the State requests it, exclude (in the case of any coverage group) any agricultural labor, *or service performed by a student*, designated by the State." 42 U.S.C. § 418(c)(5)

---

[25] States and their political subdivisions can voluntarily participate in the Social Security system by executing an agreement with the Commissioner. See Apfel, 151 F.3d at 744. Where a state or political subdivision has agreed to participate in Social Security, the contributions are taxed and collected pursuant to FICA. See id.; 26 U.S.C. § 3121(b)(C).

(emphasis added). Section 418(c)(5) cross-referenced the Social Security Act's general student exclusion, 42 U.S.C. § 410(a)(10), which has the same language as 26 U.S.C. § 3121(b)(10). The Commissioner argued in Apfel that residents could not qualify for the "student" exclusion because the stipends they received were payment for services rendered – not scholarships or fellowship grants and were part of the residents' gross income for income tax purposes. 151 F.3d at 747.

The Eighth Circuit rejected the Commissioner's argument, stressing that the focus of the relevant inquiry is different depending on whether one is deciding what is included as taxable income versus what constitutes "employment" for purposes of FICA taxation. In determining whether residents' stipends were *taxable income*, the Eighth Circuit stated that its focus was "on the nature of the stipend paid to the resident; thus, the 'threshold question' was 'whether the payment was made as quid pro quo for the services rendered.'" Id. (quoting Rockswold v. United States, 620 F.2d 166, 169 (8th Cir. 1980)). The relevant focus for purposes of the "student" exclusion from "employment" for FICA purposes, however, is not on the nature of the payments made to the residents "but on the nature of the residents' relationship with the University."[26] Id. Relying on the regulation

---

[26] Therefore, under controlling Eighth Circuit precedent, the United States' arguments that the residents' stipends had to be "nominal" or had to bear some "relationship to financial need" are unsound. In addition, such arguments contradict the regulation implementing 26 U.S.C. § 3121(b)(10), which expressly states that "the amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are immaterial." Treas. Reg. § 31.3121(b)(10)-1(b).

implementing the student exclusion under the Social Security Act,[27] the Eighth Circuit reasoned that:

> [I]f *the residents' participation* in the University's residency program is primarily educational, the residents should be considered students. If *their purpose* is to earn a living, however, they do not fit within the definition of the student exclusion.

Id. (emphasis added). Thus, "[t]he fact that payments received by the residents constitute taxable income does not mean that *the primary purpose of their relationship with the University* is not educational." Id. (emphasis added). The court of appeals concluded that "[t]he undisputed facts make it clear . . . that the primary purpose for the residents' participation in the program is to pursue a course of study rather than to earn a livelihood." Id. at 748. Among the relevant undisputed facts were that the residents were enrolled at the University, paid tuition, and were registered for approximately fifteen credit hours per semester. Id.

Finally, as discussed above, the Eighth Circuit rejected the Commissioner's argument that the court should defer to an agency ruling stating that the SSA had always held that resident physicians are not students. In so doing, the Eighth Circuit stated that the implementing regulation "contemplates a case-by-case examination to determine if an

---

[27] That regulation provided in pertinent part as follows: "Whether you are a student for purposes of this section depends on your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment." 20 C.F.R. § 404.1028(c), quoted in Apfel, 151 F.3d at 747.

individual's relationship with a school is primarily for educational purposes or primarily to earn a living." Id.

## II. Application of the "Student" Exemption of § 3121(b)(10) to Mayo Residents

The stipends paid to Mayo residents during calendar years 1994 through 1996 are "wages" for purposes of FICA taxation – that is, "remuneration for employment" – *if and only if* the services rendered by the residents constitute "employment" under FICA. In order to establish that the residents' services were within § 3121(b)(10)'s exemption for "service performed by a student in the employ of a school, college, or university," Defendants must satisfy the following two tests: (1) they must show that "the character of the organization in the employ of which the services [were] performed [was] a school, college, or university . . ." and (2) they must show that the residents were "enrolled and regularly attending classes at the school, college, or university by which [they were] employed or with which [their] employer is affiliated." Treas. Reg. § 31.3121(b)(10)-1(b)(1) & (2).

For purposes of the "student" employment exemption, the term "school, college, or university," is "to be taken in its commonly or generally accepted sense." Treas. Reg. § 31.3121(b)(10)-2(d). The Treasury Regulations also set forth the relevant inquiry for determining whether an employee has "student" status:

> The status of the employee as a student performing the services shall be determined on the basis of *the relationship of such employee with the organization for which the services are performed.* An employee who performs services in the employ of a school, college, or university, *as an*

> *incident to and for the purpose of pursuing a course of study at such school,* college, or university has the status of a student in the performance of such services.

Treas. Reg. § 31.3121(b)(10)-2(c) (emphasis added). The Court begins with whether the residents were in the employ of a "school, college, or university."

### A. "In the Employ of a School, College, or University"

To determine whether Mayo residents from 1994 to 1996 were "in the employ of a school, college, or university," one must first identify who their employer was. Having identified the organization that employed the residents, the Court will then determine whether that organization was a "school, college, or university."

#### 1. The Residents' Employer

FICA does not define the term "employer"; it does, however, define "employee" to mean, in pertinent part, "any individual who, *under the usual common law rules applicable in determining the employer-employee relationship*, has the status of an employee." 26 U.S.C. § 3121(d)(2) (emphasis added). The relevant Treasury Regulation discusses the "common-law" employer-employee relationship as follows:

> *Common law employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.
>
> (2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the

> employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. . . .
>
> (3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.

Treas. Reg. § 31.3121(d)-1(c).

The United States contends that it is "undebatable" (United States' Post-Trial Proposed Findings at ¶ 37) that the hospitals and clinics possessed the right to control and direct Mayo residents and fellows in the manner and means by which they provided patient care and performed care-giving services. Far from being "undebatable," the greater weight of the evidence establishes the contrary. While residents were certainly present in Mayo hospitals and out-patient clinics, the hospital and clinic administrators had no control over the professional lives of the residents or, for that matter, their supervising staff physicians. (Trial Tr. at 213-16, 230, 247, 279, 311.) There is no evidence that the Mayo hospitals or clinics themselves ever "hired" or "fired" residents; rather, residents applied to the MGSM and were assigned to "rotations" – which took them to hospitals and/or clinics – pursuant to a written curriculum that the program director of the given residency program established. No resident had independent clinical privileges at any point in his or her training. (See id. at 299.) Residents participated in

the care of patients who were undisputably the patients of the Mayo staff physicians and not of the hospitals or clinics where they were treated. (Defs.' Ex. 244 at Bates No. 102549; Trial Tr. at 230.) Problems regarding a resident's professional or personal behavior were addressed by the supervising staff physician and/or the director of the residency program at the MGSM. (Id. at 213-16.) There is little more than a scintilla of evidence suggesting that a Mayo hospital or clinic administrator *might* under some circumstances have some undefined level of input into the discipline of a problem resident.[28] (See Trial Tr. at 280.)

Finally, if a resident were sued for malpractice arising from his or her care-giving activities at Mayo hospitals and clinics, it is undisputed that the Foundation would provide the resident's legal defense, being self-insured with respect to malpractice coverage. (Id. at 183.) The United States cites several cases regarding hospitals' malpractice liability for the conduct of residents. The cases involving non-Mayo hospitals are irrelevant to this case, being in no way probative regarding Mayo residency programs. As for the three cases involving the Foundation or hospitals associated therewith, nothing in those opinions substantiates a finding that the Mayo-related hospitals in fact had the right to direct and control the residents. The two federal opinions

---

[28] At any given time, one percent or less of Mayo's residents rotated "off-site" to non-Mayo hospitals or clinics. (Trial Tr. at 323-24, 366.) The Foundation had affiliation agreements with such hospitals and clinics. (Id. at 324, 355-65; Defs.' Exs. 231, 269.) Residents who rotated to such sites were enrolled in their residency program at MGSM. (Trial Tr. at 362.)

address a very narrow evidentiary issue: whether the plaintiff in a medical malpractice action has waived the physician/patient privilege with respect to information in the possession of the plaintiff's treating physician. See Goburty v. Kavanaugh, 795 F. Supp. 281 (D. Minn. 1992); Filz v. Mayo Foundation, 136 F.R.D. 165 (D. Minn. 1991). The state court opinion resolved a patient's appeal from the district court's dismissal of his case for failure to prosecute after more than ten years had elapsed since the underlying treatment. Stanko v. Rochester St. Mary's Hospital, 1994 WL 385639 (Minn. Ct. App. 1994).

The Mayo Foundation is the employer of residents in the residency and fellowship programs in Rochester, Minnesota. As for residents at the programs in Florida and Arizona, the "Mayo Foundation-related employer" was the Mayo Clinic Jacksonville ("MCJ") and the Mayo Clinic Scottsdale ("MCS"), respectively. (Trial Tr. at 28-29; Pl.'s Ex. 9 at 11.) MCJ and MCS were corporate affiliates of the Foundation, and MCJ and MCS and their employees performed the educational functions of the Foundation. (Pl.'s Ex. 9 at 11.) In fact, MCJ and MCS were integral elements of the MGSM, which operated as a single entity with three sites. (Trial Tr. at 177, 181-83, 314-15.) Staff physicians, employed by the Foundation, supervised and taught the residents at all three sites throughout their training, and the patients in whose care Mayo residents participated

were patients of the supervising staff physicians.[29] (See Pl.'s Ex. 15; Trial Tr. at 299.) The director of the resident's program was the overall "boss" who controlled and directed the resident's activities. (Trial Tr. at 213, 278.) The Court finds that the Foundation was the employer of the residents.

### 2. The Employer's Status as a "School, College, or University"

Having determined that the Foundation is the entity in whose employ the residents were performing services, the next question is whether the Foundation is a "school, college, or university." Once again, the relevant starting point is the implementing regulations for the "student" employment exemption: "The term 'school, college, or university' within the meaning of this exception is to be taken in its commonly or generally accepted sense." Treas. Reg. § 31.3121(b)(10)-2(d).

Defendants argue that the Foundation is a "school, college, or university" in the commonly or generally accepted sense of the word. They have provided the Court with dictionary definitions for the terms "school," "college," and "university," such as the following:

> School: An establishment for teaching a particular skill or group of skills.
>
> College: An institution offering instruction [usually] in a professional, vocational, or technical field.

---

[29] Even those residents who, in the advanced stages of their programs, had been appointed as senior resident associates (for non-surgery and non-surgical specialties) or chief resident associates (for surgery and surgical specialties), were still supervised in the clinical and hospital care they provided by assigned staff physicians. (Pl.'s Ex. 15.)

> University: An institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees.

See Webster's Third New Int'l Dictionary (1993). Defendants contend that, in light of the educational activities conducted by the Foundation and the substantial facilities it offers, the Foundation easily falls within those definitions.

The United States challenges the Defendants' recourse to dictionary definitions, arguing that the proper test for evaluating whether an organization is a "school, college, or university" is the identification, through objective evidence, of the organization's "primary purpose." The government contends that, by examining cases and regulations pertaining to such Internal Revenue Code terms as "educational institution" and "educational organization," one properly arrives at a "primary purpose" test.

The legal premise supporting the government's analysis – namely, that the most logical place to look for the "commonly and generally accepted sense" of a term is the Internal Revenue Code – is both counterintuitive and inconsistent with the plain meaning of the exclusion's implementing regulation. If the Internal Revenue Service had intended the term "school, college, or university" in § 3121(b)(10) to have the same scope and meaning as "educational institution" (found in 26 U.S.C. § 170(b)(1)(A)(ii)) or "educational organization" (found in 26 U.S.C. § 151(e)(4)(A)), it could have clearly and explicitly given the phrase such a scope and meaning by cross-referencing those Code provisions and their implementing regulations. The Service did not do so, opting instead for a simple and straightforward statement that the term "school, college, or university"

should be taken in its commonly and generally accepted sense. The Court concludes that a "primary purpose" standard is not the relevant test.[30]

In support of its argument that the record does not permit a finding that the Foundation is a school,[31] the United States cites "objective evidence" consisting primarily of the Foundation's expenditures. (See Pl.'s Exs. 17B and 17C.) For example, on the Foundation's "Consolidated Statements of Activities" for 1995, it appears that $1.569 billion, or approximately 79.2%, of the Foundation's total expenses ($2.015 billion) was attributable to "patient care, whereas about 4.6% ($92.2 million) was attributable to "clinical and other education." (Pl.'s Ex. 17B at 13.) The Consolidated Statements of Activities for 1996 present similar figures.[32] The United States also points out that, in a 1998 self-study report for purposes of accreditation with the North Central Association of Colleges and Schools, the Foundation stated that its "educational purposes are *embedded within its larger purpose of providing the very best patient-oriented medical care*, and the

---

[30] Even if a "primary purpose" test applied to the "school, college, or university" issue, the Foundation would satisfy that test. The Foundation is a 501(c)(3) non-profit institution having as its charitable purposes medical education and scientific research. The Foundation operates five medical schools and, as discussed below, spends more on medical education and research than it receives from patient care.

[31] The United States objected to and moved to exclude "subjective" evidence that the Foundation is a "school" during the years in question. The Court concurs with the United States that subjective beliefs as to the Foundation's status as a school is not relevant to the Court's inquiry. It has not relied on such testimony.

[32] Of the Foundation's total expenses in 1996 ($2.330 billion), approximately 79.4% ($1.849 billion) is attributed to patient care and approximately 4.2% ($97.8 million) is attributed to "clinical and other education." (Pl.'s Ex. 17C at 14.)

purpose of advancing the quality of care through biomedical research." (Pl.'s Ex. 18 at 57 (emphasis added).) In the same report, the Foundation indicated that "[c]linical care is by far Mayo's largest activity." (Id. at 74.)

For their part, Defendants have presented objective evidence outweighing that presented by the government. It is undisputed that the Foundation could provide patient care far more cost-efficiently *without* residents because of the time and effort required to supervise and teach them. (Trial Tr. at 125.) The Foundation's financial statements establish that – between 1994 and 1996 – the Foundation had negative net revenue from patient care.[33] (Trial Tr. I at 70-73.) That is, if one compares the actual revenues generated by patient care to the expenses associated with that care, the Foundation would have been in a net loss position were it not for other income from grants, charitable contributions, and returns on investments. (Id.) Thus, on a net basis, the Foundation was *spending* more on clinical education and research during the years in question than it was receiving from patient care. (Id. at 73.)

---

[33] The Court notes that, in February 1969, the Internal Revenue Service sent a letter to the Foundation regarding the integration of the Mayo Clinic, where patient care was provided, into the Foundation. (Defs.' Ex. 313.) The letter addressed the impact of the integration on the tax-exempt status of the Foundation under § 501(c)(3) of the Internal Revenue Code. The tax-exempt purposes of the Foundation were in 1969 – and continued to be in the mid 1990s – education and scientific research. The IRS noted that the Mayo Clinic could not "be operated on a larger scale than is reasonably necessary to contribute to your exempt functions," (id. at 2) and noted that the clinic would "contribute importantly to your educational and scientific purposes and is commensurate in size with those activities and thus will not constitute an unrelated trade or business within the meaning of section 513 of the Code." (Id.)

The quality of a graduate medical education program depends directly on the breadth and quality of patient care pursued at the clinical institutions. (Trial Tr. at 184.) Put another way, a substantial and diverse patient base, together with the pursuit of high quality care by staff physicians and other members of the patient care team, is necessary for providing appropriate training to residents. "Actual care in the service of patients is inherent in the educational process. It really cannot be separated from that. Playing just an observational role in this is not the same as actually being involved directly in patient care." (Trial Tr. at 184.) Because the objective of residency programs is ultimately to make physicians capable of caring for patients twenty-four hours a day and seven days a week, it is impossible to separate "education" from "patient care." Thus, the principal classroom for residents must be the clinical setting because patient care in a medical specialty is what residents are receiving training for.

It is significant that the Foundation, through its graduate education committees, seeks to ensure that allied healthcare personnel perform ancillary procedures that have no "educational value," such as drawing blood, starting IVs, setting up electrocardiograms, and scheduling tests. (Pl.'s Ex. 35 at 8; Trial Tr. at 185.) Residents at Mayo are not treated as a "cheap" source of labor, as the government has implied.[34] By reducing the

---

[34] Indeed, the United States' own exhibits undercut this assertion. See, e.g., Pl. Ex. 18 at 85 ("Students and residents have been seen primarily as 'learners' rather than inexpensive care providers since the inception of [the Foundation's] schools. This is the reason that autonomous budgets, largely protected from the ups and downs of clinical revenues, were established to fund the educational purposes of Mayo Foundation.").

non-educational components of the residency programs to a minimum, the MGSM committees sought to ensure that education, not service, was the focus of the residents' experience. (Id.; Defs.' Ex. 244 at Bates No. 102555.)

The Court finds that the Mayo Foundation, a non-profit, charitable, tax-exempt institution, constitutes a "school" within the term "school, college, or university" for purposes of § 3121(b)(10).

## III. Were the MGSM Residents "Students"?

The final component of the "student" exemption of § 3121(b)(10) is the requirement that the employee in question be a "student." The statutory test for student status is whether the individual was "enrolled and regularly attending classes at the school, college, or university by which he [or she] is employed or with which his employer is affiliated." Treas. Reg. § 31.3121(b)(10)-1(b)(2). The implementing regulation further provides that

> [t]he status of the employee as a student performing the services shall be determined on the basis of *the relationship of such employee with the organization for which the services are performed*. An employee who performs services in the employ of a school, college, or university, *as an incident to and for the purpose of pursuing a course of study at such school*, college, or university has the status of a student in the performance of such services

Treas. Reg. § 3121(b)(10)-1(c) (emphasis added). Subsection (c) is comparable to the implementing regulation the Eighth Circuit considered in Apfel; both focus on the relationship between the resident and the organization for which the services were

performed. Thus, as in Apfel, the proper analysis involves "a case-by-case examination" to determine whether the residents' relationship with the organization was primarily for educational purposes or primarily to earn a living. The Court begins with the statutory tests of enrollment and the regular attendance at classes.

### A. "Enrollment" in a Residency Program

The residents at Mayo between 1994 and 1996 were clearly "enrolled." Admission to an MGSM residency program was then (and is now) based on merit, taking into account the applicant's personal background, training, education, recommendations, and interviews. The MGSM entered the data pertaining to those admitted into a residency program into the "MEdS" record system, the academic records system maintained by the Foundation for all of its schools. A dean of the MGSM would send an appointment letter to the admittee, asking that the admittee return a copy to the MGSM with a notation indicating whether he or she was accepting or declining admission. (Trial Tr. at 170.) Upon receiving an affirmative response from the admittee, an administrative secretary at MGSM would record a "Y" (for "Yes") in the "Enrolled" data field of the MEdS system. (Defs.' Ex. 306; see also Trial Tr. at 78, 170, 318.) The residents clearly were enrolled in the MGSM, an unincorporated division of the Foundation.

### B. Regular Attendance at Classes

The United States contends that, in order to ascertain whether Mayo residents "regularly attended classes," the Court should apply the legal standard set forth in a state

intermediate appellate court decision, Fettes v. Mayo Foundation for Medical Education and Research, 547 N.W.2d 423 (Minn. Ct. App. 1996). The issue before the court in Fettes was whether the services of a psychology fellow at the MGSM were excluded from covered employment under Minnesota's re-employment statutes. The court of appeals relied on a Minnesota Rule defining "regularly attending classes" as "meeting the minimum attendance required for a student's course of study in pursuit of a degree." Id. (citing Minn. R. 3315.0530, subpt. 6 (1993)). Finding that the psychology fellow had not been "pursuing a degree," had attended no classes, and had taken no examinations, the court of appeals concluded that the exclusion for enrolled students who were regularly attending classes did not apply. Id. (citing Minn. Stat. § 268.04, subd. 12(15)(g)(2) (repealed and re-codified at Minn. Stat. § 268.035, subd. 20(20))).

The government's argument that this Court should utilize a "minimum attendance required . . . in pursuit of a degree" standard is not consistent with the Code provision and its implementing regulation. The Treasury Regulation states that an employee is a student where his or her services were performed "for the purpose of *pursuing a course of study*." Treas. Reg. § 31.3121(b)(10)-1(c). Taking the term "school, college, or university" in its commonly and generally excepted sense, the Court concludes that a "course of study" at a "school, college, or university" might not – and need not – lead to a degree. Furthermore, in Apfel, the Eighth Circuit made no distinction between University of Minnesota medical residents who were degree candidates and those who were not, having analyzed cases

acknowledging that only a portion of the University's medical residents were degree candidates. Cf. Rockswold v. United States, 620 F.2d 166 (8th Cir. 1980), aff'g 471 F. Supp. 1385 (D. Minn. 1979).

The record presented at trial established that the residency programs included (1) core curriculum conferences, (2) primary care conferences, (3) grand rounds, (4) morbidity and mortality conferences, and (5) journal clubs. (Pl.'s Ex. 35 at 8; Trial Tr. at 197-201, 298.) These conferences and grand rounds were routinely and regularly scheduled throughout the week. (See id.) Internal medicine residents, for example, were expected to attend approximately 900 lectures and conferences dedicated to resident training. (Defs.' Ex. 268, sec. 28.) Attendance at the conferences and teaching rounds was mandatory. (See Trial Tr. at 298.) Furthermore, residents were required to participate in daily teaching rounds on their rotations, the purpose of which was to draw out and explore all of the salient teaching points presented by each patient on the service.

A finding that residents "regularly attended classes" is not undercut by the fact that residents at the MGSM – unlike the University of Minnesota residents in Apfel – were not registered for hours of credit. The MGSM defined the subject matter areas to be covered in a residency program through a schedule of rotations, and the residents' performance in each subject matter rotation was evaluated, graded, and recorded on the residents' transcripts. The Mayo residents were "regularly attending classes."

**C. The Residents' Purpose in Participating in Residency Programs**

The United States has repeatedly characterized a residency as "on-the-job" training. (See, e.g., Trial Tr. at 26.) That characterization misses the mark. As a threshold matter, it ignores the uncontroverted evidence, discussed above, that residents applied to and enrolled in residency programs. The Mayo hospitals and clinics did not "hire" residents with the view of providing them some training as part of their term of employment. Furthermore, there is no evidence that any Mayo resident had any expectation of continued employment with the Foundation following their residencies; indeed, as noted above, the former residents who testified at trial stated that they had no such expectation. In addition, the United States' argument is contradicted by substantial evidence establishing that the MGSM's residency programs possessed highly structured curricula. (See, e.g., Pl.'s Ex. 36 at 6-10; Pl.'s Ex. 37 at 7.)

The former residents also consistently and credibly testified that their purpose in enrolling in a residency program at Mayo was educational – to gain the knowledge and skill necessary to practice in a specialty area of medicine. (Trial Tr. at 244, 263, 265, 294, 379; see also id. at 313.) Residents were not attracted to the MGSM's residency programs because of the stipend. (Id. at 275, 294.)

The United States argues that once residents have completed one year of their residency and obtained a Minnesota state medical license, they can "moonlight" in area emergency rooms and urgent care centers. According to the government, the residents are

therefore fully capable of "seeing, diagnosing, and treating patients independently." (See Pl.'s Ex. 13.) From the testimony at trial, the Court finds that the nature of the patient care services provided during "moonlighting" are significantly different from the services associated with the residency programs. A resident moonlighting in an emergency room would address low priority, low acuity problems such as earaches, sore throats, and lacerations. (See Trial Tr. at 245.) Furthermore, residents clearly engaged in "moonlighting" *for the purpose of earning income*, not for purposes of obtaining training in their chosen specialty, as they were doing in their residency. (Id. at 244-45.) Defendants have established by a preponderance of the evidence that the residents' purpose in participating in MGSM's residency programs was for education and not for earning a living.

### D. The Performance of Services as an Incident to and for the Purpose of Pursuing a Course of Study

From the foregoing, the Court finds that the patient-care services residents provided were for the purpose of pursuing a course of study in graduate medical education. The United States challenges Defendants' ability to establish that the residents' services were "incidental to" a course of study. The government argues that virtually all patients admitted to the Mayo hospitals in Rochester, Scottsdale, and Jacksonville for the years 1994 through 1996 were seen by residents. (See Pl.'s Ex. 8.) It points out that Defendants themselves, in the Residency Program Directors' Handbook, stated that "[p]atient care obligations should not differ significantly during the residency

period compared to what would be necessary to deliver appropriate care when practicing that medical specialty." (Defs.' Ex. 201 at 20; Trial Tr. at 347-48.) Furthermore, the services of a licensed resident providing care in an outpatient setting could be billed to Medicare and to third-party payers. (See Trial Tr. at 343.) Thus, the United States contends, Mayo residents were working in the hospitals and clinics between fifty and eighty hours per week, an activity that dominated any "course of study" being pursued.[35]

Time alone cannot be the sole measure of the relationship between services performed and a course of study. Unrebutted evidence establishes that large portions of the patient-care services performed by residents – such as physical examinations and the review of test results – were repeated by the supervising staff physicians who were ultimately responsible for the patients' care.[36] (See, e.g., Trial Tr. at 120-21.) The learning process on clinical rotations consisted largely of residents making suggestions to the staff physicians and the staff physicians correcting the residents. (Id. at 120.) A

---

[35] The United States also presented evidence that, nationwide, there has been a recent effort to limit resident duty hours to eighty hours per week. (Pl.'s Exs. 43, 45.) In a nationwide survey of residents conducted in 1998, general surgery residents reported working an average of 104 hours per week and obstetrics/ gynecological residents reported working an average of 93 hours per week. (Pl.'s Ex. 45; Trial Tr. at 353-54.) There is no dispute, however, that the Mayo Foundation did not, in the years in questions, schedule residents for more than eighty hours per week in a clinical setting.

[36] Dr. Brian McGlinch, an anesthesiology resident at Mayo during the relevant time period, testified that his presence was not critical to the delivery of patient care; the services he was providing could be provided by someone else. Thus, if he needed to be excused from his clinical responsibilities to attend a lecture or conference, a nurse anesthetist would relieve him of his duties so that he could attend the lecture or conference. (Trial Tr. at 243.)

former Mayo resident, contrasting his work as a resident to his work as a staff physician, testified that more than just a change in the rate of pay was involved when he ceased to be a resident and became a staff physician:

> You are given all the information to take care of patients as a resident, but really when you have the responsibility of taking care of the patients in an environment where there is nobody looking over your shoulder any longer, that's where you learn how to be a physician, because up until that time . . . well, *the whole time that you are a resident, there is someone looking over your shoulder that's responsible for what you do.* But there's a metamorphosis that comes with clinical experience when you finish your residency and you have the responsibility. The job changes. I have colleagues that I can ask for advice, but no one is looking over my shoulder saying, "Don't give that medicine."

(Trial Tr. at 250-51 (emphasis added).) The Court finds that the patient care services provided by residents in the MGSM residency programs were incidental to and for the purpose of pursuing a course of study in postgraduate medical education.

## IV. The Refunds and Interest

Defendants seek a refund of FICA contributions paid on stipends awarded in calendar years 1994 and 1996. They also seek an award of additional interest owed on the amount refunded for taxes paid in calendar year 1995.

With respect to calendar years 1994 and 1996, the net refund amounts due and owing to Defendants are $3,436,850.81 and $4,564,259.41, respectively. These figures represent the total amount of taxes paid for each year, less the 1994 and 1996 tax computational adjustments acknowledged by Defendants. (See Defs.' Ex. 317A.) Defendants are further entitled to interest on these amounts through the date of payment,

to be computed in the manner provided by 26 U.S.C. § 6611. Furthermore, pursuant to the stipulation of the parties (Defs.' Ex. 339), the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *non-corporate taxpayer* applies to $1,421,890.01 of the 1994 tax refund and $1,850,182.81 of the 1996 tax refund, and the interest rate provided in that same section for overpayments of tax by a *corporate taxpayer* applies to $2,014,960.80 of the 1994 tax refund and $2,714,076.60 of the 1996 tax refund.

With respect to Defendants' claim for additional interest on the 1995 refunded taxes, Defendants are entitled to receive a net amount of $1,113,512.01, plus interest thereon from July 2, 1999 through the date of payment, as computed in the manner provided in 26 U.S.C. § 6611. That net amount equals the amount stated in paragraph 13 of the parties' stipulation less the interest through July 2, 1999 on the 1995 tax computational adjustment that was conceded by Defendants in Exhibit 317A. Pursuant to the stipulation of the parties (Defs.' Ex. 339),

(a) the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *non-corporate taxpayer* applies to that proportion of the $1,113,512.01 (47.49%) that the total of column 1 of Exhibit 339, ¶ 10 ($560,317.51), less 2.64% of $3,593.36 ($94.86), bears to the sum of the totals of columns 1 and 2 ($1,183,354.65), less $3,593.36; and

(b) the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *corporate taxpayer* applies to that proportion of the $1,113,512.01 (52.51%) that the total of column 2 of Exhibit 339, ¶ 10 ($623.037.14), less 97.36% of $3593.36 ($3,498.50), bears to the sum of the totals of columns 1 and 2 ($1,183,354.65), less $3,593.36.

## CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED, ADJUDGED, AND DECREED** that

1. Mayo Foundation is, within the meaning of 26 U.S.C. § 3121(b)(10), a "school, college, or university."

2. Medical residents at the MGSM between 1994 and 1996 were "employed" by Mayo Foundation, within the meaning of 26 U.S.C. § 3121(b)(10).

3. Medical residents at the MGSM between 1994 and 1996 were "students" within the meaning of § 3121(b)(10), enrolled in and regularly attending classes at the MGSM, a division of Mayo Foundation.

4. The United States shall have and receive nothing on its claim for return of the refund paid to Defendants in connection with FICA taxes collected for stipends paid to residents of the Mayo Graduate School of Medicine in calendar year 1995, except that Plaintiff shall recover the amount of the 1995 tax computational adjustment ($13,793.56) conceded by Defendants in Exhibit 317A;

5. Defendants shall recover additional interest on the 1995 refunded taxes in the amount of $1,113,512.01, plus interest thereon from July 2, 1999 through the date of payment as computed in the manner provided by 26 U.S.C. § 6611. Pursuant to the stipulation of the parties (Defs.' Ex. 339),

> (a) the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *non-corporate taxpayer* applies to that proportion

of the $1,113,512.01 (47.49%) that the total of column 1 of Exhibit 339, ¶ 10 ($560,317.51), less 2.64% of $3,593.36 ($94.86), bears to the sum of the totals of columns 1 and 2 ($1,183,354.65), less $3,593.36; and

(b) the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *corporate taxpayer* applies to that proportion of the $1,113,512.01 (52.51%) that the total of column 2 of Exhibit 339, ¶ 10 ($623.037.14), less 97.36% of $3593.36 ($3,498.50), bears to the sum of the totals of columns 1 and 2 ($1,183,354.65), less $3,593.36.

6. With respect to FICA taxes paid on stipends awarded in calendar year 1994, Defendants shall recover from the United States the sum of $3,436,850.81, plus interest thereon through the date of payment, to be computed in the manner provided by 26 U.S.C. § 6611. Furthermore, pursuant to the stipulation of the parties (Defs.' Ex. 339), the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *non-corporate taxpayer* applies to $1,421,890.01 of the 1994 tax refund, and the interest rate provided in that same section for overpayments of tax by a *corporate taxpayer* applies to $2,014,960.80 of the 1994 tax refund.

7. With respect to FICA taxes paid on stipends awarded in calendar year 1996, Defendants shall recover from the United States the sum of $4,564,259.41, plus interest thereon through the date of payment to be computed in the manner provided in 26 U.S.C. § 6611. Furthermore, pursuant to the stipulation of the parties (Defs.' Ex. 339), the interest rate provided by 26 U.S.C. § 6621(a)(1) for overpayments of tax by a *non-corporate taxpayer* applies to $1,850,182.81 of the 1996 tax refund, and the interest rate provided in that same section for overpayments of tax by a *corporate taxpayer* applies to

$2,714,076.60 of the 1996 tax refund.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 4, 2003

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8[th] Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*